**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE, NORTHERN DIVISION AT KNOXVILLE**

| | | |
|---|---|---|
| **PSCC HOLDINGS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO. _____** |
| | ) | |
| **vs.** | ) | **JURY DEMAND** |
| | ) | |
| **GREG WALKER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff PSCC Holdings, LLC ("PSCC"), for its Complaint against Defendant Greg Walker, states as follows:

This is an action to enjoin Defendant, a tenant on adjacent property, from engaging in misconduct specifically designed to harm PSCC and its business relationships and customer prospects, destroy PSCC's reputation, and deprive PSCC, its invitees and its guests from the safe and quiet enjoyment of PSCC's property. For several years, and recently escalating, Defendant has engaged in an intentional, malicious and systematic campaign to destroy the commercial viability of PSCC's property by blasting music, excessively revving power tools and recreational vehicles, slinging insults and slurs at guests, and even by exposing his private parts to guests and their children. Defendant's misconduct must cease.

## PARTIES

1.      Plaintiff PSCC is a Florida Limited Liability Company with its principal place of business in Florida, and is qualified to conduct business in Tennessee. Each member of PSCC is a citizen and resident of the State of Florida.

1

2.     Defendant Greg Walker is a Tennessee resident, currently residing in his mother's house, located at 1181 Pine Mountain Road, Sevierville, Tennessee (the "Walker House").

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter involves citizens of different states and the amount in controversy exceeds $75,000.00.

4.     This Court has personal jurisdiction over Defendant pursuant to Fed R. Civ. P. 4(k) because Defendant resides in Tennessee and has caused tortious injuries to PSCC in Tennessee and is, therefore, subject to the jurisdiction of a court of general jurisdiction in Tennessee.

5.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), because Defendant resides in this judicial district, a substantial part of the events giving rise to the claim at issue occurred in this judicial district, and the properties that are the subject of this action are located in this judicial district.

## THE EVENT VENUE

6.     PSCC owns a parcel of real property located at 1175 Pine Mountain Road, Sevierville, Tennessee 37862 (the "Venue"). The Venue consists of three buildings: a two-story pavilion—the Smoky Mountain Pavilion—and two cabin-style lodges situated on each side of the pavilion—the Rocky Top Lodge to the north and the Smoky Mountain Lodge to the south.

7.     PSCC operates the Venue as an event space, available for short term rental to guests to use for events such as weddings, religious outings and company retreats. PSCC's customers may rent one or both of the Lodges alongside the Pavilion for their and their guests' enjoyment.

8.     The Venue is part of a larger development commonly known as Parkside Resort (the "Resort"), which consists of cabins and related amenities including, but not limited to, hiking

trails, picnic areas, pavilions, a fitness center, and outdoor games. The Resort's location in the scenic Smoky Mountains is, in large part, a reason for the interest in the Resort.

9.     The Venue, and the Resort in general, are managed by a company commonly known as Accommodations by Parkside, LLC ("Parkside").

10.    PSCC and Parkside entered into a management agreement whereby PSCC delegated the authority to Parkside to manage the maintenance and short-term rental of the Venue. As such, Parkside is PSCC's agent for purposes of maintaining and booking the Venue.

11.    At the time Parkside books or reserves the Venue for a guest, that guest is presented with and required to execute a Guest Agreement. A true and correct copy of a sample Guest Agreement is attached hereto as **Exhibit A**.[1]

12.    As demonstrated by the Guest Agreement, the underlying property owner for a reservation in the Resort – in this case, PSCC – is the intended third-party beneficiary of the Guest Agreement.

## PARKSIDE'S QUIET HOURS POLICY

13.    Parkside has had a longstanding policy regarding quiet hours since it opened in 2005. According to the current policy applicable to this dispute, guests are required to adhere to specific "quiet hours" at the Venue (and the Resort generally) to avoid disturbance to other guests and nearby tenants, which includes Defendant. Specifically, guests are forbidden to make noise which could disturb nearby properties between the hours of 11:00 p.m. and 7:00 a.m.

14.    These quiet hours are communicated by Parkside to each guest at check in. They are also included as a term of the Guest Agreement. See **Exhibit A**, p. 2 ("Noise Policy").

---

[1] Aside from changing the guest's information, the reservation dates, and the specific property within the Resort being reserved, the Guest Agreement that Parkside presents to each guest is identical.

15. Parkside also installed signs (the "Resort Rules") on the balconies of the Smoky Mountain Lodge closest to and facing the Walker House, notifying guests of the quiet hours policy. A true and correct copy of the Resort Rules is attached hereto as **Exhibit B**.

16. In addition to dictating quiet hours, the Resort Rules prohibit "house parties," "fireworks," and "outdoor music." The Resort Rules instruct guests of the Venue to "be respectful of other guests and residents." Guests of the venue are also informed that if they violate the Resort Rules, they are subject to eviction and/or fines.

17. Parkside strictly enforces the quiet hours policy at the Venue to be respectful to neighbors, including Defendant, and guests of the Resort.

18. Additionally, Parkside requires all DJs and wedding entertainers performing during weddings at the Venue to cease playing music by 11:00 p.m. on the date of any events.

## DEFENDANT'S CAMPAIGN OF HARASSMENT

19. Defendant lives in a house currently owned by his mother, located at 1181 Pine Mountain Road, Sevierville, Tennessee 37862 (the "Walker House"). The Walker House is located directly to the south of the Venue, approximately only fifty to seventy-five feet from the Venue. The Walker House is on a slope approximately fifty feet downhill from the Venue. A true and correct copy of a Resort map showing the location of the Venue and Walker House is attached hereto as **Exhibit C**.

20. Based on the Venue's proximity to the Walker House and the change in elevation, Defendant's activities at the Walker House are easily seen and heard by guests of the Venue.

21. Sometime in early 2022, Defendant spoke with staff members at Parkside and told them that, if guests of the Venue did not cease making noise, Defendant was going to "do what I have to do."

22.     Around approximately April 2022, Defendant began disturbing weddings and other events hosted at the Venue. For example, Defendant would play music loudly, in an attempt to interrupt wedding ceremonies and celebrations, and at all hours or to prevent guests from resting at the Venue.

23.     Defendant owns a large set of speakers, believed to be nearly three feet tall, which he has on numerous occasions moved to the front porch of the Walker House – directly facing the Venue – to blare music at the guests and ruin their stay. Venue guests can clearly hear the speakers and they sometimes overwhelm the sound system at the Venue where guests are mere feet away.

24.     In addition to blasting music in the direction of the Venue, Defendant employed various other methods to interrupt and terrorize guests at the Venue.

25.     On or about May 21, 2022, Defendant played false tornado sirens through his speakers at an extremely high volume around approximately 7:45 p.m., causing a panic amongst Venue guests and other guests in the Resort.

26.     Parkside fielded calls from concerned guests during the event who believed a tornado, wildfire or other natural disaster may be occurring on the dark, unfamiliar mountainside.[2]

27.     On May 29, 2022, Defendant again blared the false tornado siren, which can be heard for miles, at 5:00 a.m. while Venue guests were sleeping.

28.     In addition to Venue guests, a neighbor and homeowner in the Resort, Linda Staley, heard and was terrified by the sirens. She reported Defendant's actions to the police.

---

[2] In 2016, Sevier County, Tennessee suffered a particularly devastating wildfire. Upon hearing the siren, some guests feared that a wildfire was spreading in the mountains and they needed to evacuate the Resort.

29.     On numerous occasions, Defendant disturbs guests at the venue in other ways, including by yelling and swearing at guests, excessively revving the engines on his tractor and dirt bike at unreasonable hours, and mowing his mother's lawn at unreasonable hours.

30.     In an effort to further intimidate guests at the Venue and to discourage potential future guests, Defendant erected a large, neon yellow sign at his property line, facing the Venue. A true and correct copy of a photograph of the sign is attached to the Complaint as **Exhibit D**, and appears as follows:



31.     On numerous occasions, while an event was hosted at the Venue and guests were on site, Defendant would aggressively approach this sign at the property line and violently bang his hands on the sign to intimidate and scare guests.

32.     Over the years, numerous guests have complained about Defendant's conduct.

33.     In approximately 2022, a church group, Deeper Still Ministries, declined to return to the Venue – despite a history of booking the property annually for their religious retreat – because of Defendant's intimidation, threats and nuisances during their previous stay.

34.     In one particular instance, when the Venue was booked for a wedding, Defendant proceeded with his typical harassment, noise pollution and disruption campaign against the guests in the days leading up to the wedding. A guest of the wedding party went to Defendant's house to speak with him about the disruptions, and Defendant purportedly brandished a firearm at the guest. The guest proceeded to report the encounter to Parkside.

35.     On or about April 15, 2023, during a wedding at the Venue, Defendant was playing loud music from the Walker House, swearing at wedding guests, showing guests the middle finger, and triggering a house alarm to disturb the wedding guests. At approximately 3 a.m. the morning of April 16, 2023, Defendant discharged firearms at the Walker House two different times to disturb guests at the Venue who were trying to rest.

## DEFENDANT IS ARRESTED FOR EXPOSING HIMSELF TO VENUE GUESTS

36.     In an effort to stop Defendant's campaign of intimidation and harassment, on April 21, 2023, PSCC, through counsel, sent Defendant a cease and desist, informing him that his excessive noise had created a nuisance for the Venue and demanding that he cease continuing to create disturbances for Venue guests. A true and correct copy of this letter is attached as **Exhibit E.**

7

37.     The very next day, Defendant retaliated against the Venue's guests during an afternoon wedding. Defendant played loud music, shouted obscenities at guests, and gave guests the middle finger. Ultimately, Defendant disrobed and exposed his bare buttocks and genitals to guests at the Venue. Among those present to witness Defendant's malfeasance were minor children.

38.     Defendant then yelled a string of obscenities at the guests from his mother's front porch and raised both middle fingers towards the Venue and wedding party.

39.     A true and correct copy of the video showing Defendant performing these obscene demonstrations will be contemporaneously filed via a Notice of Manual Filing.

40.     That same day, the Sevier County Sherrif's Office arrived in response to complaints about Defendant's obscene actions, examined the video, interviewed wedding guests, and proceeded to arrest Defendant for indecent exposure. A true and correct copy of the police report from the incident is attached as **Exhibit F**.

41.     After his arrest, Defendant was placed on probation. During his probationary period the Venue continued operating for several months without disturbance from Defendant. However, the peace did not last long.

42.     In approximately September 2023, Defendant – after his probationary period ended – started to blast music and disturb Venue guests once again.

43.     That same month, in an effort to mitigate Defendant's ire and shield guests from Defendant, exterior walls were installed to portions of the Smoky Mountain Lodge closest to and facing the Walker Property.

44.     Despite PSCC's (and Parkside's) best efforts to appease Defendant and deescalate his ire at Venue guests, those efforts have not been successful to date.

45.     In September 2024, while a group of guests stayed at the Smoky Mountain Lodge, Defendant disturbed the group by loudly driving and revving the engine on his pickup truck up and down his mother's driveway, positioned just south of the Lodge, during unreasonable hours.

46.     Throughout the years, Defendant has taken to a number of different ways to intimidate and terrorize Venue guests, including:

    a.  Blaring bible verses, sermons, music, and other loud noises from large speakers on his front porch;

    b.  Discharging firearms during wedding events;

    c.  Driving trucks, dirt bikes, tractors, excavators, and other loud vehicles and machinery within earshot of weddinggoers and revving engines to disturb events and/or sleep at the Venue;

    d.  Pounding on metal signs on his property;

    e.  Threatening and harassing guests verbally; and

    f.  Allowing his dogs to run on Venue property; and walking up to cabins and entering the common areas of the Venue uninvited – trespassing.

## NEGATIVE REVIEWS, CANCELLATIONS, AND OTHER ISSUES

47.     Defendant has made it clear that he will not stop his attempts to ruin the events held by the Venue's innocent guests.

48.     As a result of Defendant's conduct, PSCC has been required to refund guests for their stay at the Venue, or Parkside has had to relocate guests to other Parkside properties, thereby depriving PSCC of short term rental income and rental opportunities.

9

49.     Further, Defendant's conduct has caused reputational harm to PSCC and the Venue, which is subject to negative reviews, deterring prospective guests from renting the Venue and thereby depriving PSCC of related income opportunities.

50.     Defendant himself has taken his hatred for PSCC and the Venue online. In a Google review dated November 6, 2024, made by "Greg W" who describes himself as "the neighbors[,]" Defendant provided a one-star review for the Venue. In the review, Defendant admits to disturbing guests at the Venue: "You think your [*sic*] a victim because you had to listen to me one night of your stay after you threw a huge party????" A true and correct copy of the Greg W review is attached hereto as **<u>Exhibit G</u>**.

51.     In addition to Defendant's defamatory review, guests have posted negative reviews because of Defendant's misconduct. Some recent examples include:

   a.   A review by Christen Ellis, who booked the Venue for a wedding, included a warning to other potential wedding parties booking the Venue about Defendant's conduct:

   > There is a neighbor, whom owns a private residence, very close to this cabin. The very first day (within the first 30 minutes) of our stay, the neighbor turned on a sound system. The music was so loud that we couldn't have conversations on the back porch. The day of our wedding we had music playing to do our dancing and the neighbor again turned on a sound system to drown out our own music. It was very upsetting that we couldn't enjoy our wedding reception due to the neighbors music. On another night the neighbor turned on his sound system and actually left his property and kept the music playing. The music was played from 9pm-11:30pm. The music is played through a sound system, so it's very loud! Not only was it obnoxious, it was disruptive and inconsiderate.

   b.   In another review, Thomas Chambers, whose cousin booked the Venue for a wedding, wrote about the Defendant:

> Oh, and then there is the neighbor..... He has a sign facing the venue that says, "this is not a place for loud parties and music. People live here, show some respect." Below that is a sign that says, "they knew this when they took your money." We were really confused by this until the wedding started. He blasts music so loud it drowns out everything. You couldn't hear the music being played in the venue nor could you even have a conversation with the other guests. Parkside knows about this and will not disclose this upon signing a contract. I would suggest that anyone considering this place for their "perfect" day, look elsewhere. There are hundreds of better options in the area with much better management. And then they have the audacity to call me a liar, (see response). I was there, and saw her tears. Believe what you want, but be very cautious when doing business with this place.

    c.   In another review, Lakin Cole, who attended a wedding at the Venue, wrote:

> downstairs didn't work. Not to mention when the wedding was going on the neighbors Beside the venue play music way to loud. The wedding coordinator told the DJ to turn the music down even though they were blaring music! They also had the sign up beside the venue. At the bottom it says "they knew this when they took your money". Don't recommend

    d.   On October 3, 2023, Ashley B wrote a review to Parkside's TripAdvisor page about the Venue, stating:

> Maintenance came on Friday to check the hot tub and never returned to fix it. If you are planning a wedding here please beware of the angry neighbor that nobody will tell you about. He has huge signs hanging directly out on the backside of the cabin that reads, This is not the place for loud music and parties. People live here, show some respect! They knew this before they took your money'
> Yes they absolutely do know about this and will not inform you that this man has speakers on his back porch and will start blaring banjo music right at the time of your event! It is so loud that you can't hear your own music or DJ over his and you can also hear it inside of the cabin. He played it until after 10:00pm and it was the most creepiest feeling. The wedding coordinator told us after the fact that he does this all of time and has even been to jail for chasing someone with a machete! How do these

True and correct copies of these reviews are attached hereto as **<u>Collective Exhibit H</u>**.

    52.   These reviews have worsened over the years. In 2025 alone, guests posted numerous negative reviews related to the Venue, including:

    a.   A review by Dennis Stefanelli, who wrote that the "neighbor blasted music at 6am [*sic*] in a revenge for wedding noise. [Don't] rent out a huge house with a pavilion for a wedding if neighbors will offensively react."

    b.   In August 2025, a Google user with the alias "Pot Pie" wrote:

11

> We stayed at the Smoky Mountain Lodge. There is a permanent resident behind the cabin that blared gospel sermons over a loud speaker from 11 PM until the next morning due to noise from a wedding that took place at the wedding venue. It stopped mid-morning and than resumed again while we were in pool the next afternoon.
>
> Parkside Resorts is aware of this individual; but can't do anything about it. This area has no noise ordinances. My opinion is that Parkside Resorts is operating in bad faith by not making renters aware of this ongoing issue.
>
> Especially given the cost of this rental unit and this ongoing issue, we would never consider renting from Parkside Resorts again. Hopefully, you will read this review prior to making a decision to rent.
>
> Take a look at the photo below of the signs that the neighbor put up.

c. Also in August 2025, user Jessica B wrote a negative review of the Venue, stating:

> If you are staying in the Smokey mountain lodge and make noise during the wedding you paid thousands of dollars for, the neighbor will be sure to blast his gospel, banjo and other music DURING the wedding and again from about 6am to 9am the following morning. The wedding venue/front office doesn't disclose this and they don't care. Go somewhere else where the views are just as good!

d. In October 2025, Kayla Walker, a Venue guest, wrote:

> If you're considering booking this venue for your wedding, please be warned — there's a neighbor from hell right beside the property who will absolutely ruin your night.
>
> We turned our music off at 8:30 p.m. and had only a small group of 10–15 people gathered quietly around the outdoor fireplace — not loud at all. Despite that, the neighbor blasted music from a large speaker placed directly on his property line facing the cabin, rode ATVs back and forth, and did everything he could to disrupt the evening.

e. On October 23, a user named Atiya A, who booked the Venue for her wedding, left the following negative review on Google:

> acknowledgment was offered. What made matters worse was a situation that the venue team was clearly aware of but never disclosed to us. There is a local resident nearby who is extremely disruptive, and there is even a large sign displayed on his property warning guests not to play music and implying the venue knowingly ignores this issue when taking people's money. During our actual wedding ceremony, this individual played loud music — including Bible verses and religious tracks — which completely disrupted the moment. The music continued later at night, disturbing our guests while they were trying to sleep. We reported this immediately,

f. On October 29, 2025, user Ralph M., who stayed at the Venue for a wedding, wrote:

> The only "challenge" with this venue is the next-door neighbors, who clearly have issues living in proximity to a commercial resort. This was made evident by the posted signs viewable from the rear balconies whereby the neighbors indicated something about the need for guests to keep noise down and be respectful because people live here, etc.
>
> Well … these same neighbors were plainly resentful of the fact that normal party music was played at the wedding reception (music that properly ended at 10:30 pm) and were intent on underscoring the point by BLARING loud outdoor radio music until 2:30 AM and then starting up again at 5:30 AM so as to disturb the guests' ability to sleep. Needless to say, my wife and I were happy to leave this establishment bright and early the next morning.

g.    In November of 2025, Alison Byers, a bride who rented the Venue for her wedding, left a one-star review, largely because of Defendant's actions, writing:

> If I could give this venue zero stars, I absolutely would. I'm writing this so that no other bride has to go through what we did. We stayed for three days and everything seemed fine leading up to the wedding — until the morning of our ceremony.
>
> As we began setting up our sound system, we noticed several passive-aggressive signs in the surrounding yards warning guests to "respect the neighbors" and "remember people live here." We brushed it off at first, thinking it wouldn't be a problem since our wedding was a small, intimate family event — not a loud party.
>
> Then, out of nowhere, our ceremony was nearly ruined. A neighbor, who we later learned is infamous to anyone familiar with this venue, began blasting extremely loud music through outdoor speakers directly next to the property. The music was so loud that no one would have even been able to hear us say our vows.

True and correct copies of these reviews are attached hereto as **<u>Collective Exhibit I</u>**.

53.    Compounding this problem is the fact that nearly all of these reviews blame PSCC and its agent, Parkside, for Defendant's misconduct, greatly damaging the Venue's and PSCC's reputation as the owner of the Venue.

54.    Defendant's ongoing nuisance, his defamatory comments regarding the Venue, and the negative reviews that have accumulated on the internet for the Venue and Parkside has resulted in tangible, monetary harm in addition to the reputational harm discussed above.

13

55.     The income generated by short term rentals – especially those for events such as weddings – for any given weekend, totals approximately $15,000.00 to $20,000.00. Thus, each cancellation of a reservation or loss of a prospective guest causes significant harm to PSCC.

56.     Last year alone, PSCC lost numerous business prospects because of Defendant's misconduct. For example:

      a.    On July 25, 2025, Amanda Cahoy informed Parkside she would be seeking a different venue for her wedding because the "reviews about a disgruntled neighbor . . . w[ere] enough to make [her] look elsewhere."

      b.    On August 27, 2025, Brynn Titone declined to reserve the Venue for a wedding because she feared Defendant would retaliate for having her wedding there.

      c.    On or about November 26, 2025, a couple cancelled their wedding reservation at the Venue due to Defendant's misconduct.

True and correct copies of contracts or written memorialization relating to cancelled reservations at the Venue are attached hereto as **Collective Exhibit J**.

57.     There are many more instances where PSCC had cancellations, lost prospects, or had to refund guests as a result of Defendant's misconduct. PSCC's investigation is ongoing.

58.     Most recently, on February 13, 2026, a guest complained about Defendant, reporting that he was outside screaming racial slurs towards the guests and the Venue.

59.     It is abundantly clear that Defendant's objective is to deter guests from reserving the Venue and put PSCC out of business.

60.     As a direct result of Defendant's actions, PSCC has suffered lost revenue and reputational harm in the short term rental and wedding venue business in an amount to be proven at trial. Based on current information available, this amount is greater than $75,000.

14

61. Moreover, injunctive relief is needed to protect PSCC's business and contractual relationships with its guests, to protect safety and quiet enjoyment of PSCC and its guests, and to protect the reputation of PSCC.

## CAUSES OF ACTION

## COUNT I - NUISANCE

62. PSCC realleges and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

63. Defendant, through his actions of blaring music, yelling at and threatening guests, exposing himself to guests and children, excessively revving engines on his vehicles and equipment, banging on signs, discharging firearms, blasting false tornado sirens, and other similar disruptive actions, has created a nuisance that disturbs PSCC's and its guests' free use of the Venue.

64. Defendant's actions are unreasonable and offend the senses, endanger the health of others, and interfere with PSCC's and its guests' use and enjoyment of the Venue.

65. Defendant engaged in these actions to annoy, inconvenience, discomfort, harm and injure PSCC and its guests, and to injure their personal comfort and free use, possession and occupation of the Venue.

66. Defendant's actions are of no utility or social value and are meant simply to retaliate, harass, annoy, and torture out-of-towners seeking to enjoy the Venue, the Smoky Mountains, and to injure the business of PSCC.

67. Defendant has, through his nuisance, caused, and will continue to cause PSCC reputational harm, lost profits, and the devaluation of its business and real property in an amount to be proven at trial.

15

68.     The harm to PSCC will be irreparable and the full scope of damages will be difficult to ascertain.

69.     Defendant's actions were willful, malicious and intentional, as evidenced by his statements, posting of signage, and posting of online content.

70.     Defendant's actions are ongoing and threaten imminent, continued harm to PSCC. Under Tennessee law, injunctive relief—in addition to monetary relief—may be awarded where a nuisance is ongoing, cannot be abated through money, and if other relief is inadequate. *See West v. Luna*, No. 01A01-9707-CH-00281, 1998 WL 467106 (Tenn. Ct. App. Aug. 12, 1998).

71.     Defendant's actions entitle PSCC to the recovery of monetary and injunctive relief.

## COUNT II – PROCUREMENT OF BREACH OF CONTRACT: TENN. CODE ANN. § 47-50-109

72.     PSCC realleges and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

73.     PSCC is the third-party beneficiary of valid and enforceable agreements between its agent, Parkside, and guests whereby guests reserved the Venue from PSCC in exchange for monetary payments to PSCC.

74.     Defendant, as a neighbor with intimate knowledge of the business of PSCC, its clientele, and its operations, knew of the existence of PSCC and Parkside's contracts with its clients.

75.     Indeed, Defendant erected a sign on his property line warning guests and prospective guests that PSCC "knew" about him when accepting guests' money to stay at the Venue.

16

76.     Defendant, through his nuisance and his representations to clients of PSCC online, intended to induce or procure those clients to breach and/or refuse to perform valid contracts with PSCC and Parkside.

77.     Defendant's actions were willful, malicious, and intentional, as evidenced by his statements, posting of signage, and posting of online content.

78.     The breach of these contracts was the direct and proximate result of the Defendant's conduct.

79.     As a direct and proximate result of Defendant's actions, PSCC has incurred damages, and will continue to incur damages, for reputational harm, lost profits, and the devaluation of its business and real property in an amount to be proven at trial.

80.     The harm to PSCC will be irreparable and the full scope of damages will be difficult to ascertain.

81.     Defendant's actions entitle PSCC to the recovery of monetary and injunctive relief, as well as treble damages under T.C.A. § 47-50-109.

**<u>COUNT III – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP</u>**

82.     PSCC realleges and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

83.     PSCC, through its agent, Parkside, had existing and prospective business relationships with potential clients who are or have been looking for wedding or event venues.

84.     Defendant, as a neighbor with intimate knowledge of the business of PSCC, its clientele, and its operations, knew of the existence of PSCC and Parkside's relationships with prospective clients.

85.     Indeed, Defendant erected a sign on his property line warning guests and prospective guests that PSCC "knew" about him when accepting guests' money to stay at the Venue.

86.     Defendant, through his nuisance and his representations to clients of the Venue online, intended to and had induced those prospective clients to terminate their relationships with PSCC.

87.     Defendant's actions were willful, malicious, and intentional, as evidenced by his statements, posting of signage, and posting of online content.

88.     Defendant acted with improper motive and malice to impede and harm the business of PSCC, ultimately putting them out of business.

89.     Defendant used improper, tortious, illegal, threatening, and defamatory means to procure the termination of PSCC's relationships with prospective clients.

90.     As a direct and proximate result of Defendant's actions, PSCC has incurred damages, and will continue to incur damages, for reputational harm, lost profits, and the devaluation of its business and real property in an amount to be proven at trial.

91.     Defendant's actions entitle PSCC to the recovery of monetary relief.

## COUNT IV – INJUNCTIVE RELIEF

92.     PSCC realleges and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

93.     Defendant has demonstrated a continuous, systematic effort and intention to interrupt events held at the Venue, despite efforts from PSCC, Parkside, guests, and the police to cease the conduct.

18

94. Defendant's conduct continues to escalate, including threats of violence, brandishing firearms, discharging firearms, playing sirens, and violently banging on a sign on his property line.

95. Each instance that Defendant is permitted to continue this unlawful activity causes further disruption to PSCC's and its guests' quiet enjoyment of the Venue. It also leads to further negative reviews that harm the business reputation of PSCC and devalues its property.

96. Based upon Defendant's prior nuisances and interference with PSCC's business relationships and contracts, PSCC has sufficient grounds to seek injunctive relief to prohibit Defendant from engaging in any further disturbances, whether lawful or unlawful, which may interfere with the operations of the Venue or PSCC's quiet enjoyment of its property during the pendency of this action.

97. Defendant's willful and intentional conduct has caused, and will continue to cause, significant and immediate harm to PSCC that cannot be compensated with damages.

98. Absent entry of a temporary injunction directing, restraining, and enjoining Defendant from creating a nuisance and interfering with PSCC's business relationships and contracts, the business interests, reputation, and real property interests of PSCC will suffer, and PSCC will face irreparable harm that cannot adequately be compensated by monetary damages.

99. As set forth in the separate application for temporary restraining order and temporary injunction, PSCC has no adequate remedy at law and cannot easily compute the potential loss of business, revenue, reputation, and client and customer relationships that will result from Defendant's actions, if not enjoined.

19

## COUNT V – PUNITIVE DAMAGES

100.    PSCC realleges and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

101.    Defendant engaged in tortious conduct towards PSCC which was malicious and intentional.

102.    Defendant's actions, including firing guns within earshot of Venue patrons, playing sirens in the dark, exposing himself to guests and children, and other similar conduct is egregious and demonstrates a disregard for social obligations.

103.    As a direct and proximate result of Defendant's actions, PSCC has incurred damages, and will continue to incur damages, for reputational harm, lost profits, and the devaluation of its business and real property in an amount to be proven at trial in an amount to be proven at trial.

104.    Defendant's actions entitle PSCC to the recovery of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, PSCC respectfully prays that this Court grant the following relief:

A.    Enter a temporary restraining order and, upon hearing, a temporary injunction directing, restraining, and enjoining Defendant (and those utilizing his or his mother's property) from (1) engaging in obnoxious, harmful, or threatening behaviors which create a nuisance for PSCC, Parkside, or the Venue, and (2) taking actions which interfere with PSCC's business relationships with existing and prospective clients or which would cause the termination of present and future contracts between PSCC, Parkside, and guests;

B.    Enter an Order against Defendant awarding actual, treble, and punitive damages to PSCC in an amount to be determined at trial;

20

C.    That the Court award such further relief as is merited under law and equity.

## JURY DEMAND

PSCC demands a trial by jury on all issues so triable.


**THIS IS PLAINTIFF'S FIRST APPLICATION FOR EXTRAORDINARY RELIEF**


Dated: March 3, 2026.

Respectfully submitted,


*/s/Nicholas W. Diegel*
P. Edward Pratt (TN #012758)
Nicholas W. Diegel (TN #034211)

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
265 Brookview Centre Way, Suite 600
Knoxville, Tennessee 37919
Telephone: (865) 549-7000
epratt@bakerdonelson.com
ndiegel@bakerdonelson.com

*Attorneys for Plaintiff PSCC Holdings, LLC*

21